UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LYNDA L. WYNIA, ) | |
| ) | |
| Plaintiff, ) | NO.  CV-09-5051-LRS |
| ) | |
| v.   ) | ORDER |
| ) | |
| METROPOLITAN LIFE INSURANCE ) | |
| COMPANY, INC., ) | |
| ) | |
| Defendant, ) | |
| _____) | |

BEFORE THE COURT is the Defendant MetLife's Motion for Summary Judgment (Ct. Rec. 15) and Plaintiff Lynda Wynia's Motion for Partial Summary Judgment (Ct. Rec. 19).  These motions were heard with oral argument on June 3, 2010, at which time the court indicated the motions would be considered under advisement.

**I.  SUMMARY OF FACTS**

The following facts are undisputed, except where otherwise indicated.  On May 21, 1986, Ms. Wynia applied for a life insurance policy through New England Mutual Life Insurance Company ("New England").  At the time she applied for life insurance, Plaintiff made a prepayment of $9,435.  On June 10, 1986, New England issued Ms. Wynia a Standard Life Paid-Up at 95 Life Insurance Policy (Number 008259433) with a face value of $500,000 ("Policy").  New England merged with Defendant Metropolitan Life Insurance Company, Inc. ("MetLife") on or about August 30, 1996.

ORDER - 1

Plaintiff elected to make quarterly premium and annual loan interest payments by borrowing against the Policy itself pursuant to an Automatic Premium Loan ("APL") provision in the Policy. As a result of electing the APL provision, Plaintiff's loan balance and annual loan interest payments continued to increase throughout the course of the insurance policy. Although Plaintiff received Annual Policy Summaries from MetLife that set forth the cash value and increasing loan balance of her Policy, it is undisputed that she did not read those statements nor did she keep track of those items throughout the life of the Policy.

Pursuant to Section 4 of the Policy, the APL provision provided for the automatic premium payment from dividend accumulations and policy loans. Prior to MetLife issuing a loan on the Policy to pay premiums, Ms. Wynia's account would have to be first in default and then if the default was not timely cured, a Policy loan would automatically be taken out to pay the past due premium. Plaintiff asserts that the duty to pay premiums was unconditional if the premium(s) were not paid within 31 days of their due date. MetLife argues that this was not unconditional, rather it had a duty to pay premiums only if the Loan Value of the Policy was sufficient to pay the quarterly premium. Section 4 reads:

> **Option for Automatic Premium Payment from Dividend Accumulations and By Policy Loans**.
>
> If this Option has been elected in writing, and if a premium is not paid by the end of its grace period, a premium will be paid automatically to the next quarterly due date: *First*, by using any Dividend Accumulations; and *Second*, by using any available Loan Value of the Policy. If the unpaid premium is an annual or a semi-annual premium, it will be paid in full, if possible. If the amount available is not sufficient to pay a premium to the next quarterly

ORDER - 2

due date, no premium will be paid.

Section 8 of the Policy provides a definition for Loan Value. Section 8 reads, in pertinent part:

> **Loan Value**
>
> The Loan Value of the Policy is the amount which with loan interest will equal the Cash Value of the Policy and of any Paid-Up Additions on the next loan interest due date or on the next premium due date, whichever is the smaller amount. During the grace period of an unpaid premium the "next" premium due date means the due date of the unpaid premium.

Also under Section 8 of the Policy, in a subsection entitled "Repayment of Loans," the Policy provides that if the Policy Loan Balance at any time exceeds the Cash Value of the Policy and of any Paid-Up Additions, the Company will mail a notice to you and to any assignee.

Because Ms. Wynia elected to make premium payments by borrowing against the policy itself, the Policy loans bore interest pursuant to a provision in Section 8:

> **Interest on Loans; Policy Loan Balance.**
> Policy Loans bear interest as shown in Section 1. Interest accrues daily. The Policy Loan Balance at any time means Policy Loans outstanding plus interest accrued to date. Loan interest is due on the annual premium anniversary date each year. Loan interest not paid when due will be added to the Loan and will bear interest.

On December 10, 2000, the Policy lapsed due to nonpayment of premiums. In June 2001, Plaintiff made an out-of-pocket payment in the amount of $2,984.03 as part of her reinstatement of the Policy. Also in 2001, as part of an MDL class action settlement agreement to which Plaintiff was a party, MetLife applied approximately $7,000 in settlement proceeds towards the dividend

ORDER - 3

1 value of Plaintiff's Policy.

2 In June 2008, which was Ms. Wynia's annual Policy anniversary date, a notice of Payment Due was sent to Ms. Wynia for $28,230.20. On this payment notice, and all prior notices she received from MetLife over the years, Ms. Wynia's insurance was characterized by Met Life as "Permanent Life Insurance."  The June 2008 Notice reflected an annual premium of $8,020 for the 2008-2009 Policy period, plus $20,210.20 in interest due. Shortly thereafter, according to Plaintiff, an "Overdue Premium Reminder" was also sent to Ms. Wynia like the notices she had received in all of the prior years.

12 MetLife, on the other hand, maintains that it specifically notified Plaintiff in June and August of 2008 that the Loan Value of her Policy was insufficient to pay the September quarterly premium payment. Both notices specifically stated: "Insufficient loan value requires interest be paid."

17 After Plaintiff failed to make the 2008 loan interest payment, the $20,210.20 interest was capitalized to the loan principal pursuant to the APL provision of the Policy on August 20, 2008.  As a result of the loan interest capitalization, there was no longer sufficient loan value in the Policy to make the September 2008 quarterly premium payment of $2,105.25 according to Defendant MetLife.

24 On September 13, 2008, MetLife mailed Plaintiff an Overdue Premium Reminder regarding her overdue payment of the September 2008 premium.  This document stated:

ORDER - 4

> **IMPORTANT**
>
> To maintain your valuable protection and avoid lapse of your policy, the premium must be paid within 31 days after the due date. You should refer to your policy for exceptions to this rule.

Plaintiff recalls receiving and "partially reading" the notice from MetLife regarding her overdue premium payment. Plaintiff did not pay the September 2008 premium.

Section 5 of the Policy contained a provision regarding nonpayment of the premiums, which states in pertinent part:

> **Lapse of Policy.** Any premium which is not paid by its due date is in default. If it remains unpaid at the end of its 31-day grace period and is not paid automatically under option in Section 4, the Policy will lapse.
>
> **Lapse Options.** If the Policy lapses because a premium is not paid, any Net cash Value of the Policy will be used to continue the Policy in force either as Paid-Up Insurance or Extended Term Insurance as stated below ...
>
> **Election of Lapse Option.** If the Policy is in a Standard Policy Class the use of the Extended Term insurance Option at lapse will be automatic, unless you elect the Paid-Up Insurance Option ...

On November 20, 2008, the Policy lapsed for nonpayment of premiums. After the Policy lapsed, the loan was repaid out of the Policy's cash value, and the balance was used to provide Paid-Up Term Insurance for Ms. Wynia through August 14, 2010. On December 6, 2008, MetLife mailed Plaintiff a lapse Notice to advise that her Policy lapsed for nonpayment of premiums, and that the Policy was being continued as Extended Term Insurance, which would expire on August 14, 2010.

Plaintiff understood that MetLife generated the lapse Notice

ORDER - 5

because of her failure to pay the September 2008 premium.  The lapse Notice also provided Plaintiff with instructions regarding how to reinstate her Policy:

> **How to Reinstate Your Policy**
>
> - If your request is received by January 10, 2009 a premium payment in the amount of $4,210.50 is required.  This will pay your policy through March 10, 2009.
>
> - If your request is received after January 10, 2009, there may be additional amounts due, and you may be required to send additional medical information.
>
> - Please complete the questions below. Remember to sign and date your request and return it in the envelope provided. Incomplete requests will not be processed.

Plaintiff did not make or attempt to make the required premium payment by January 10, 2009 as requested in pursuant to the lapse Notice. Plaintiff has not contacted MetLife to date to inquire about reinstatement of the Policy.

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Roberts v. Continental Insurance, Co.*, 770 F.2d 853, 855 (9th Cir.1985). Summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Triangle Mining Co., Inc. v. Stauffer Chemical Co.*, 753 F.2d 734, 738 (9th Cir.1985).

## III. ANALYSIS OF SUMMARY JUDGMENT MOTIONS

### A. Plaintiff's Motion For Partial Summary Judgment

The narrow issue before the court on Plaintiff's motion for partial summary judgment is whether MetLife properly applied

ORDER - 6

Section 8 of the Policy in its Loan Value computation.

Ms. Wynia alleges that MetLife breached its contract of insurance by lapsing her policy rather than paying the September-December 2008 quarterly premium with a policy loan. Plaintiff argues the undisputed facts reveal that the Loan Value of Ms. Wynia's policy was well in excess of the $2,100 needed to pay the September-December 2008 quarterly premium. As such, Plaintiff argues summary judgment is warranted on this issue, and requests that the question of damages, attorney fees and Ms. Wynia's other claims[1] be reserved for future proceedings.

Plaintiff asserts that under Washington law, interpretation and construction of an insurance contract is a question of law and may properly be determined on summary judgment. *American Star Insurance Company v. Grice,* 121 Wn.2d 869, 874 (1993). Plaintiff further states that language in an insurance contract is to be given its ordinary meaning and courts should read the policy as the average person purchasing insurance would. *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55,64, 1 P.3d 1167 (2000). An insurance policy is ambiguous if, on its face, it is fairly susceptible to two reasonable, but different interpretations. *Greer v. Northwestern National Insurance Co.*, 109 Wn.2d 191,198, 743 P.2d 1244 (1987).

At oral argument, Plaintiff's counsel demonstrated that the Section 8 provision of the Policy was susceptible to two very different interpretations. Specifically, counsel argued that

---

[1] Ms. Wynia also claims Met Life violated Washington's Consumer Protection Act and acted in bad faith. However these claims are not the subject of her partial summary judgment motion.

ORDER - 7

depending on how one interpreted the definition of "Loan Value," one could end up with a Loan Value of $6,766.63[2] or $234,965.94.[3] Plaintiff concludes that if a clause remains ambiguous, even after consideration of extrinsic evidence, the meaning and construction most favorable to the insured must be employed, even though the insurer may have intended otherwise. *Greer* 109 Wn.2d at 201.

Plaintiff explains that to determine the Loan Value under Section 8 for Ms. Wynia's Policy, the Cash Value of the Policy is added to the value of any loan interest that had been accrued as of the anniversary date of her Policy, plus any Paid-Up Additional Insurance as of that date. Also under Section 8 of the Policy, in a subsection entitled "Repayment of Loans," the Policy provides that if the Policy Loan Balance at any time exceeds the Cash Value of the Policy and of any Paid-Up Additions, MetLife will mail a notice to you and to any assignee.

According to Plaintiff, despite notification that there was insufficient loan value to pay interest, MetLife made a payment on the Policy via a Policy Loan for the quarter June 10-September 10, 2008, and made a $20,210.20 interest payment via a loan on the Policy, both without requiring the payment of loan interest. MetLife made a quarterly payment on the Policy as a loan in the amount of $2,105.25, which posted on August 20,2008, and applied $20,210.20 in loan interest on the same date, bringing Ms. Wynia's loan balance to $274,942.95. At the time, Ms. Wynia asserts her Policy had a face value of $500,000, plus an additional $377,604

---

[2] Plaintiff used MetLife's Statement of Gain to arrive at $6,766.63.

[3] Plaintiff used MetLife's Internal Status Report to arrive at $234,965.94.

ORDER - 8

of Paid-Up Additional Insurance.

Plaintiff further indicates that MetLife's Overdue Premium Reminder dated September 10, 2008, provided no notification to Ms. Wynia that she had insufficient loan value to pay the amount due via Policy Loan. MetLife was required to send her notice, which it did not according to Plaintiff. MetLife disputes this contention stating that it mailed all proper notices to Plaintiff. Plaintiff argues that she simply received the same generic default notices as she had for the previous twenty years, which she expected to be paid by the Policy loan as in the past.[4]

Plaintiff asserts that rather than follow the Policy language in computing whether there was sufficient "Loan Value" to pay the September-December 2008 quarterly payment, MetLife added a "subjective" element. Based on a FRCP Rule 30(b)(6) deposition, MetLife testified that in addition to the definition of "Loan Value" under the Policy, loan value "would have to allow for loan interest that would accrue. So if - - they wouldn't be given 100% of that loan value, otherwise, every time someone took a loan, when that loan interest came due, their policy would be in danger of lapsing for the loan exceeding the cash value. So there's a little room provided for interest that's coming up." Plaintiff's SOF 19.  In describing what "a little room" was, MetLife testified:

> Well what I'm going to do is, if you want a max loan, like what's the maximum I can take out of this policy I'm going to take your guaranteed cash value plus your dividend value

---

[4] MetLife disputes this contention. On December 10, 2000, Ms. Wynia's Policy lapsed due to nonpayment of premiums. In June 2001, Plaintiff made an out-of-pocket payment in the amount of $2,984.03 as part of her reinstatement of the Policy.

ORDER - 9

          and if your loan interest rate is 8% I'm going to basically give you 92% of what's really available. So we would - - the math equation for that would be guaranteed cash value plus dividend cash value divided by 1.08. That means I'm not charging you for that interest, but I'm leaving you some breathing space to accrue that loan interest.  Plaintiff's SOF 20.

    In its FRCP 30(b)( 6) deposition, the MetLife designee computed the available "Loan Value" for the September-December 2008 payment using two methods. Without leaving any "head room," MetLife initially calculated that the Loan Value was $8,536.18 below what was needed to pay the September-December 2008 quarterly payment. In reducing the Loan Value by the "head room," the MetLife designee took the Cash Value and Paid-Up Additions of $283,000, and discounting that by 8%, MetLife came up with $262,000. This amount was reduced by the quarterly premium of $2,100 and the existing Loan Balance of $275,000, which totaled about $277,000. According to MetLife, this produced a deficit of $14,000. Plaintiff's SOF 22.

    Plaintiff further indicates that upon further questioning, MetLife admitted that without providing for the "head room," there would have been sufficient Loan Value in the Policy to make the September 2008 quarterly payment. Plaintiff's SOF 23.  At oral argument on June 3, 2010, Plaintiff more specifically argued that MetLife, in calculating the loan interest to determine the Loan Value-improperly went forward beyond September 10th and used the coming year's accruing interest when it calculated the Loan Value figure.

    Plaintiff adds that according to MetLife's own Statement of Gain sent to Ms. Wynia in October 2008, the "Cash Value" plus any

ORDER - 10

"Paid-Up Additions" equaled $287,208.44 as of September 2008. Plaintiff's SOF 24. The Statement of Gain also set forth the outstanding loan balance, plus interest through the September payment date, of $280,441.81. Plaintiff's SOF 24.  The Loan Value, calculated by subtracting the loan balance plus accrued interest from the Cash Value plus the Paid-Up Additions, equaled $6,766.63. As the September-December quarterly premium payment was $2,105.25, there was more than enough Loan Value to make the payment according to Plaintiff Wynia.

Plaintiff concludes that the only reason MetLife determined there was insufficient Loan Value to pay the September-December 2008 quarterly payment was that the loan had insufficient "head room of loan interest." The policy, however, does not expressly provide for utilization of "head room" when calculating Loan Value.

The court has reviewed the briefing and has considered the arguments made at the June 3rd hearing.  Construction of an insurance contract is a question of law. In interpreting an insurance contract, we look to the intent of the parties, which is ascertained from the language of the contract. *Tsapralis v. Pub. Employees Mut. Cas. Co.*, 77 Wash.2d 581, 582, 464 P.2d 421 (1970). "Construction which contradicts the general purpose of the contract or results in hardship or absurdity is presumed to be unintended by the parties." *Nautilus, Inc. v. Transamerica Title Ins. Co. of Wash.*, 13 Wash.App. 345, 349, 534 P.2d 1388 (1975). Language in an insurance contract is to be given its ordinary meaning, and courts should read the policy as the average person purchasing insurance would. *Hayden v. Mut. of Enumclaw Ins. Co.*,

ORDER - 11

141 Wash.2d 55, 64, 1 P.3d 1167 (2000). Determining the legal consequences flowing from a contract term involves a question of law. *Denny's Restaurants, Inc. v. Security Union Title Ins. Co.*, 71 Wash.App. 194, 201(1993).

"A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning." *Mayer v. Pierce County Med. Bureau*, 80 Wash.App. 416, 421, 909 P.2d 1323 (1995). But a contract provision is not ambiguous merely because the parties suggest opposite meanings. *Mayer*, 80 Wash.App. at 421, 909 P.2d 1323. "[A]mbiguity will not be read into a contract where it can reasonably be avoided[.]" *McGary v. Westlake Investors*, 99 Wash.2d 280, 285, 661 P.2d 971 (1983). Further, the *Berg*[5] court specifically rejected "the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible." 115 Wash.2d at 669, 801 P.2d 222. Extrinsic evidence is admissible to "illuminate[ ] what was written, not what was intended to be written." *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wash.2d 178, 189, 840 P.2d 851 (1992).

This case turns on the meaning of the words *loan interest* in the phrase "[t]he Loan Value of the Policy is the amount which with loan interest will equal the Cash Value of the Policy and of any Paid-Up Additions on the next loan interest due date or on the next premium due date, whichever is the smaller amount." Plaintiff argues loan interest in this case should not have been considered beyond September 10th (premium due date at issue). It

---

[5]*Berg v. Hudesman*, 115 Wash.2d 657, 669, 801 P.2d 222 (1990).

ORDER - 12

appears, however, that Defendant used the coming year's accrued interest (beyond the premium due date) to calculate Loan Value.

The court finds that in calculating the loan interest to determine the Loan Value, Section 8 does <u>not</u> expressly provide for utilizing interest, as MetLife allegedly has done, in calculating Loan Value with respect to the lapsing of Plaintiff's Policy. Generally, where a provision of an insurance contract is fairly susceptible of two different constructions, the construction most favorable to insured will be adopted. *Jack v. Standard Marine Ins. Co., Ltd., of Liverpool, England*, 33 Wash.2d 265 (1949).

The court finds that Plaintiff's partial summary judgment is granted inasfar as the court finds that Section 8 does not expressly provide for utilization of loan interest accruing for a year in advance. The court further finds that in the absence of agreement of the parties as to what the exact Loan Value was at the time of lapsing, this fact remains in dispute based on the current state of the record, for the factfinder to determine at trial.

**B.   Defendant's Motion for Summary Judgment**

Defendant argues in its motion for summary judgment (and opposition to Plaintiff's Motion for Partial Summary Judgment) that there are no genuine issues of material fact regarding Plaintiff's failure to make premium and loan interest payments within the grace period set forth in her life insurance policy. Namely, Defendant asserts, Plaintiff never read any portion of her policy; made no effort to understand the terms or conditions of her policy; ignored the Annual Policy Summaries that set forth the cash value and loan balance of her policy; ignored two separate

Notices of Payment Due that explained there was insufficient loan value in her policy to make annual loan interest and premium payments in 2008; disregarded the Overdue Premium Reminder that advised her the policy would lapse if the September 10, 2008 overdue premium was not paid within 31 days; never took steps to avoid lapse of the policy by paying the overdue premiums; and never attempted to reinstate the policy by paying the overdue premiums after the policy lapsed in 2008.

### 1.  **Beach of Contract Claim**

Defendant urges this court to dismiss Plaintiff's breach of contract claim arguing the undisputed evidence establishes that MetLife properly lapsed Ms. Wynia's Policy for nonpayment of the premiums.  Plaintiff elected not to make additional out-of-pocket premium payments and instead pay quarterly premiums by borrowing against the Policy itself pursuant to the APL provision.  By electing to do this, the loans increased over the term of the Policy and bore interest.

Defendant further asserts that Plaintiff made no effort to read any portion of the Policy or contact anyone at MetLife to inquire about the terms and conditions of the Policy. As the loan balance grew based on her election to make premium payments by borrowing against the policy itself, Plaintiff testified that she never kept track of either the loan balance or cash value of the Policy.  Had Plaintiff kept track, Defendant argues, she would have discovered the decreasing loan value of her Policy required her to submit an out-of-pocket premium payment in September 2008, like she had done in June 2001 when her Policy lapsed earlier. Defendant concludes that it cannot be held liable for any

ORDER - 14

consequences that are based on Plaintiff's failure to read and inquire about the Policy.

Defendant argues that although Plaintiff realized that MetLife generated the lapse Notice based on her failure to pay the September 2008 premium, she chose not to take any action towards reinstating the Policy or paying the overdue premium. Plaintiff was advised that the Policy could be reinstated by making a premium payment of $4,210.50 by January 10, 2009. After lapsing, Plaintiff made no effort to submit that payment or take any action in an attempt to reinstate the Policy.

The court incorporates its discussion and finding above with respect to the breach of contract claim considered in Plaintiff's Partial Summary Judgment motion. As discussed in detail above, it does not appear MetLife literally followed the language if it added in the forward year's interest for "head room" in calculating the policy's Loan Value at the relevant point in time. "[S]ome breathing space to accrue that loan interest"[6] is simply not defined in Section 8 nor can MetLife read that concept into the provision without express language allowing it to do so. Although Defendant strenuously argues Plaintiff made no effort to read any portion of the Policy, the court finds it is not material in the determination of the overarching issue at hand. For the foregoing reasons, Defendant's request for summary judgment on Plaintiff's breach of contract claim is respectfully denied.

**2.    Insurance Bad Faith/CPA Claims**

Plaintiff alleges in her complaint that MetLife engaged in

---

[6]The MetLife designee discussed this concept at the FRCP 30(b)(6) deposition.

ORDER - 15

bad-faith conduct by wrongfully lapsing her life insurance policy. Plaintiff further alleges that such conduct violated the Washington Consumer Protection Act (RCW 19.86).

Insurers have a statutory and common law duty to act in good faith toward an insured.[7] Liability insurers have a "heightened duty of good faith" when a claim is presented against an insured.[8] The duty to act in good faith is "fairly broad and may be breached by conduct short of intentional bad faith or fraud."[9] Breach of the duty gives rise to a remedy sounding in tort, independent of the insurance contract.[10]

To prevail on a bad faith claim, a policy holder must establish that the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 433 (2002). This is also the rule under the Washington Consumer Protection Act. *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 699-700 (2001) (to assert Consumer Protection Act claims plaintiff must show unreasonableness of insurer's conduct).

As the Washington Supreme Court explained:

> As long as the insurance company acts with honesty, bases its decision on adequate information, and does not overemphasize its own interests, an insured is not entitled to

---

[7] RCW 48.01.030; *Tank v. State Farm Fire & Cas. Co.*, 105 Wash.2d 381, 386, 715 P.2d 1133 (1986).

[8] *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wash.2d 269, 281, 961 P.2d 933 (1998).

[9] *Indus. Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wash.2d 907, 916-17, 792 P.2d 520 (1990).

[10] *Safeco Ins. Co. of Am. v. Butler*, 118 Wash.2d 383, 389, 393-94, 823 P.2d 499 (1992).

ORDER - 16

>        base a bad faith claim or CPA claim against
>        its insurer on the basis of a good faith
>        mistake.

*Coventry Ass'n v. Am. States Ins. Co.*, 136 Wn.2d 269, 280 (1998).

Applying the bad faith standard in the summary judgment context, an insurer is ordinarily entitled to summary judgment dismissal of a bad faith claim unless the insured shows there was no reasonable basis for the insurer's actions. Stated another way, where there is no real dispute that an insurer had a reasonable basis for its actions, dismissal of the bad faith claim on summary judgment is appropriate. *See Keller v. Allstate Ins. Co.*, 81 Wash.App. 624, 633, 915 P.2d 1140 (1996) (insurer not guilty of bad faith if " 'legitimate controversy' " as to benefits due (quoting 15A George J. Couch, Couch on Insurance § 58:1 (Ronald A. Anderson & Mark S. Rhodes, 2d rev. ed.1983))); *Pruitt v. Alaska Pac. Assurance Co.*, 28 Wash.App. 802, 804, 626 P.2d 528 (1981) ("bona fide dispute" over existence and extent of damage precluded bad faith claim).

This "fairly debatable" standard for determining bad faith, as it is commonly called, is followed in the vast majority of jurisdictions.[11] The "fairly debatable" standard is identical to the traditional Washington "reasonable justification" standard. See *Kirk v. Mt. Airly Ins. Co.*, 134 Wash.2d 558, 561 (1998) (bad faith failure to defend); *Indus. Indem. v. Kallevig*, 114 Wn.2d 907, 920 (1990)(insurer acted without reasonable justification in denying coverage); *Van Noy v. State Farm Mut. Auto Ins. Co.*, 142

---

[11]See generally Douglas G. Houser, *Good Faith as a Matter of Law: The Insurance Company's Right to Be Wrong*, 27 Tort & Ins. L.J. 665, 669 (1992) (36 states follow a "fairly debatable"-type standard for bad faith claims).

ORDER - 17

Wash.2d 784, 16 P.3d 574 (2001).

As the court noted in the *Safeco* case:

> If the insurer can point to a reasonable basis for its action, this reasonable basis is significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its [conduct] was justified.

*Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 486 (2003).

A claim of bad faith in Washington is not easy to establish-the insured has a heavy burden to meet. *Overton v. Consolidated Insurance Co.*, 145 Wash.2d 417, 433 (2002) (citing *Ellwein v. Hartford Accident & Indemnity Co.*, 142 Wash.2d 766, 775 (2001)).[12]

The court finds that although one could argue there are issues of fact regarding the reasonableness of MetLife's actions in its interpretation of loan interest, Plaintiff is unable to show that MetLife's decision to lapse her Policy for the nonpayment of premiums under the totality of circumstances[13] amounted to bad faith, even if MetLife's belief that the lapse was warranted later turned out to be mistaken. Here, MetLife sent Plaintiff several notices and reminders that payment was due

---

[12] Defendant MetLife relies on the *Ellwein* decision. The Washington Supreme Court overruled *Ellwein* in the *Safeco* decision. Judge Sanders held that the insurer's assertion of reasonable basis for its denial of coverage did not entitle it to summary judgment on insured's bad faith claim against it, although insurer argued that it was entitled to summary judgment unless its policyholder could prove bad faith as a matter of law. *Smith v. Safeco Ins. Co.* 150 Wash.2d 478, 78 P.3d 1274 (2003).

[13] The determinative question is the reasonableness of the insurer's action in light of all the facts and circumstances of the case. *Kallevig*, 114 Wn.2d at 920.

ORDER - 18

according to their records, invited Plaintiff to communicate regarding reinstatement of the Policy, and evidence shows that she could have reinstated the Policy, with the option to dispute MetLife's interpretation later.

The CPA claim is derivative of the bad faith claim addressed above. As for the CPA claim, because Plaintiff could have arguably avoided the lapse, Plaintiff has an uphill battle to prove injury to her business or property, a required element under *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 792 (1986). The other four *Hangman* elements are "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; and (4) causation." *Hangman Ridge Training Stables* at 780. (1986). The court finds problematic the public interest element. Under the "public interest" prong, parties with "a history of business experience" cannot claim a CPA violation because they are "not representative of bargainers [who are] subject to exploitation and unable to protect themselves." *Hangman*, 105 Wash.2d at 794. Plaintiff had the subject policy for at least twenty years. Evidence in the record shows that Plaintiff was an educated businesswoman and investor.

"If any element is not satisfied, there can be no successful CPA claim." *Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wash.App. 104, 114 (2001). For these reasons, Plaintiff's CPA claim fails.

**IT IS HEREBY ORDERED:**

1. Plaintiff Wynia's Motion for Partial Summary Judgment, **Ct. Rec. 19,** is **GRANTED consistent with the explanation above. A**

ORDER - 19

**fact issue remains as to the Loan Value at the time of lapse, absent agreement of the parties.**

    2. Defendant MetLife's Motion for Summary Judgment, **Ct. Rec. 15, is DENIED in part and GRANTED in part.** As to the breach of contract claim, summary judgment is denied. As to the bad faith and CPA claims, summary judgment is granted in favor of the Defendant.

    IT IS SO ORDERED. The District Court Executive is directed to file this order, provide copies to counsel, and enter a judgment consistent with this order.

    DATED this 15th day of July, 2010.

                                            *s/Lonny R. Suko*
                                     _____
                                             LONNY R. SUKO
                              CHIEF UNITED STATES DISTRICT JUDGE